**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
           :
**MICHAEL TAVERAS,**           :
           :
        **Plaintiff,**    :
           :    **OPINION AND ORDER**
   - against -          :
           :    **03 Civ. 4478 (SAS)**
**THE PORT AUTHORITY OF NEW**    :
**YORK & NEW JERSEY,**           :
           :
        **Defendant.**  :
-------------------------------------------------------X
**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

Michael Taveras brings this action against The Port Authority of New York and New Jersey ("Port Authority") alleging an equal protection violation based on the Port Authority's refusal to hire him as a police officer on the grounds that he suffers from a severe color vision deficiency.[1] The Port Authority now moves for summary judgment. For the following reasons, the Port Authority's motion is granted.

## II. FACTS

---

[1] Taveras has abandoned his discrimination claims under Title VII, the ADA, New York State Executive Law, and the New York City Administrative Code. *See* Partial Stipulation of Discontinuance, dated June 9, 2005.

It is the Port Authority's stated policy that in order to become a Port Authority police officer, a candidate must be able to distinguish colors.[2] While a "mild" color vision deficiency will not disqualify a candidate, a "moderate" or "strong" deficiency will bar a candidate from employment as a Port Authority police officer.[3] As part of each candidate's medical screening process, the Port Authority's own medical staff, headed by Dr. Martin Duke, conducts an initial examination of the candidate's color vision; a candidate who cannot identify a certain number of plates is required to undergo further color vision testing by an outside specialist, Opthalmologic Associates.[4] The outside specialist then submits to the Port Authority's medical staff its overall assessment of the nature and severity of the candidate's color vision deficiency.[5] While the Port Authority's medical staff will review a report submitted by a candidate's own eye doctor, Dr.

---

[2] *See* Defendant's Rule 56.1 Statement ("Def. 56.1") ¶ 7.

[3] *See id.* ¶¶ 7, 15.

[4] *See id.* ¶¶ 6, 9-10.

[5] *See id.* ¶ 12; Plaintiff's Rule 56.1 Statement ("Pl. 56.1") ¶ 12. While Taveras does not dispute the fact that Opthalmologic Associates submits an assessment of a candidate's color vision deficiency, Taveras does object to the Port Authority's characterization of that assessment as a "report." According to Taveras, the Port Authority "receives a one-page letter or . . . a handwritten note with a conclusory comment concerning the nature and severity of the candidate's color deficiency." Pl. 56.1 ¶ 12.

Duke ultimately bases his decision as to a candidate's eligibility on Opthalmologic Associates' assessment.[6]

The Port Authority does not permit candidates to wear corrective lenses during testing to improve their color vision.[7] By contrast, nearsighted candidates may wear lenses to improve their distance vision; according to the Port Authority's hiring criteria, candidates must have uncorrected vision of no less than 20/100 in each eye and corrected vision of no less than 20/40 in each eye.[8] The Port Authority's rationale for this distinction is that while a police officer with uncorrected vision of 20/100 who loses his lenses can still see sufficiently to describe individuals and vehicles, an officer with a moderate or strong color defect could not perform accurate descriptions in the event he lost his lenses.[9]

Taveras applied to become a Port Authority police officer, and in January 2002, the Port Authority invited him to participate in its selection process.[10]

---

[6]   *See* Def. 56.1 ¶ 18.

[7]   *See id.* ¶ 16.

[8]   *See* Pl. 56.1 ¶ 24. A person who has 20/100 vision can see only at a distance of twenty feet what a person with 20/20 vision can see at one hundred feet.

[9]   *See* Def. 56.1 ¶ 16; Deposition of Dr. Martin Duke, Chief Medical Officer for the Port Authority, Ex. C to Affidavit of Angel Kelley, Counsel to the Port Authority, at 19.

[10]   *See* Def. 56.1 ¶ 3.

During the initial medical screening conducted by the Port Authority, Taveras was diagnosed with a color vision deficiency and was referred to Opthalmologic Associates for further testing.[11] The assessment submitted to the Port Authority by Ophalmologic Associates stated that Taveras has a "strong protan defect."[12] Relying on this assessment, the Port Authority's Office of Medical Services sent Taveras a letter on March 5, 2002, informing him that he was ineligible for the position of police officer.[13]

Taveras's expert, Dr. Jerome Garber, contends that the Port Authority has hired as police officers candidates with similar or more severe color vision deficiencies than Taveras's.[14] In addition, Taveras contends that Christopher Elliot, whom the Port Authority hired as a police officer in 1996, wore a corrective

---

[11] *See id.* ¶¶ 4, 11.

[12] *Id.* ¶ 14. Taveras does not dispute that Opthalmologic Associates' assessment *stated* that he has a strong defect, but he nonetheless contends that he actually suffers from only a mild defect. *See* Pl. 56.1 ¶ 14. A protan defect refers to an abnormality in the red pigment of the eye. *See* 10/19/04 Letter of Dr. Jay M. Cohen to Angel Kelley ("Cohen Let."), Ex. H. to Certification of Brian W. Raum, Counsel to Taveras ("Raum Cert."), at 2.

[13] *See* Def. 56.1 ¶ 19. The letter further stated that Taveras was not disqualified from competing for other positions within the Port Authority. *See id.*

[14] *See* Pl. 56.1 ¶ 21; 8/31/04 Report of Dr. Jerome Garber ("Garber Report"), Ex. G to Raum Cert., at 4.

contact lens to improve his color vision when he was tested.[15]  The record contains no evidence, however, to support this contention.  In his deposition, Elliot testified that while he indeed obtained a corrective lens on his own initiative, he did so only after he had undergone the color vision tests on which the Port Authority's hiring determination was based.[16]  In a sworn affidavit, Elliot stated that he has never used the corrective lens, nor has the Port Authority ever asked or required Elliot to wear the lens in the performance of his duties as a police officer.[17]

Finally, there is evidence to suggest that the tests used by the Port Authority and Opthalmologic Associates are not definitive indicators of a candidate's ability to distinguish colors.  Taveras's expert, Dr. Garber, contends that the tests are subjective and a poor means of evaluating how well a candidate

---

[15]  *See* Pl. 56.1 ¶ 26.

[16]  *See* Deposition of Christopher Elliot, Ex. D to Raum Cert., at 24.  The outside specialist who tested Elliot did not tell him the precise level of his color deficiency, but rather informed Elliot that he would submit a report to the Port Authority's medical staff.  Elliot never saw this report.  *See id.* at 31; Affidavit of Christopher Elliot ("Elliot Aff.") ¶ 3.  All of the Port Authority's medical records dated prior to September 11, 2001 — including the outside specialist's assessment of the level of Elliot's color vision deficiency — were destroyed in the terrorist attack on the World Trade Center.  *See* Port Authority's Reply Memorandum of Law at 5 n.1.  Elliot's own eye doctor diagnosed his condition as a "mild" color vision deficiency.  *See* Elliot Aff. ¶ 5.

[17]  *See* Elliot Aff. ¶ 9.

would identify colors in the course of actual law-enforcement duties.[18] The Port Authority's own expert, Dr. Jay M. Cohen, acknowledges that "severity of color deficiency is a continuum and there will always be some degree of gray area and subjectivity at the cutoff points between the groupings."[19]

## III. LEGAL STANDARD

Summary judgment is appropriate if the evidence of record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[20] "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'"[21] "A fact is material for these purposes if it 'might affect the outcome of the suit under the governing law.'"[22]

The movant bears the burden of demonstrating that no genuine issue

---

[18] *See* Garber Report at 3.

[19] Cohen Let. at 1.

[20] Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, a court may rely only on admissible evidence. *See Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004).

[21] *Overton v. New York State Div. of Military and Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[22] *Id.* (quoting *Anderson*, 477 U.S. at 248).

of material fact exists.[23] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts,"[24] and it must "come forward with 'specific facts showing that there is a genuine issue for trial.'"[25] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor.[26]

## IV. DISCUSSION

### A. Equal Protection

Taveras claims that the Port Authority treated him differently from similarly situated candidates in violation of the Equal Protection Clause of the Fourteenth Amendment. "While the Equal Protection Clause is most commonly used to bring claims alleging discrimination based on membership in a protected

---

[23] *See Powell v. Nat'l Bd. of Medical Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004).

[24] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[25] *Powell*, 364 F.3d at 84 (quoting *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993)).

[26] *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004).

class, where, as here, the plaintiff does not allege membership in such a class, he or she can still prevail in what is known as a 'class of one' equal protection claim."[27] "A successful equal protection claim may be 'brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'"[28] The Second Circuit has emphasized that in order to prevail on such a claim, a plaintiff is "required to show, not only 'irrational and wholly arbitrary' acts, . . . but also *intentional* disparate treatment."[29]

Taveras claims that the Port Authority's determination that he was not eligible to become a police officer was irrational and arbitrary in two respects. *First*, there is evidence that the Port Authority hired candidates with color vision deficiencies that are similar to or more severe than his own. *Second*, the Port Authority allows nearsighted candidates to wear corrective lenses but prohibits color deficient candidates, such as Taveras, from wearing corrective lenses.

---

[27] *Neilson v. D'Angelis*, No. 03-9074, — F.3d —, 2005 WL 1244795, at *3 (2d Cir. May 26, 2005).

[28] *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

[29] *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001) (quoting *Olech*, 528 U.S. at 565).

### B. Disparate Treatment from Other Color Deficient Candidates

Taveras has raised an issue of fact as to whether he was treated differently from other candidates with color vision deficiencies. Taveras's expert, Dr. Garber, examined the medical files of color deficient candidates whom the Port Authority ultimately hired as police officers and concluded that Taveras's deficiency is less severe than many of those candidates'.[30] This opinion raises the inference, for the purposes of this motion, that the Port Authority enforces its requirement that a candidate not suffer from a "moderate" or "strong" color vision defect in an arbitrary manner.

This issue of fact is not material, however, because Taveras has failed to come forward with any specific facts to show that the Port Authority *intentionally* treated Taveras differently from similarly situated candidates. Taveras has merely shown that his expert, Dr. Garber, disagrees with Opthalmologic Associates' overall assessment of the deficiencies of a number of candidates. In other words, by looking at the test results of these candidates, Dr. Garber has determined that, in his opinion, various candidates whom Opthalmologic Associates evaluated as suffering from only "mild" defects in fact suffer from more

---

[30] *See* Garber Report at 4.

severe defects. While this disagreement potentially demonstrates that the Port Authority's outside specialist misinterpreted some candidates' test results, it does not raise an inference that the Port Authority *knew* that it was treating Taveras differently from anyone else. Indeed, the record contains nothing to suggest that the chief of the Port Authority's medical staff, Dr. Duke, who determined on the basis of Opthalmologic Associates' diagnosis that Taveras was ineligible for employment as a police officer, knew of any other candidate with a condition similar to or worse than Taveras's who had nonetheless become a Port Authority police officer. Without some evidence of this knowledge, no reasonable juror could infer that the Port Authority intended to treat Taveras differently from other candidates.

Nor does the evidence suggesting that the color vision tests used by Opthalmologic Associates are subjective and poor indicators of a candidate's ability to identify colors in the course of performing police work raise an issue of material fact. Once again, the tests' potential failings do not raise the inference that the Port Authority intended to treat Taveras differently from any other candidate. On the contrary, Taveras was required to undergo the same tests as any candidate who failed to identify a certain number of plates during the initial color vision screening. Therefore, no reasonable juror could conclude that the Port Authority

intentionally treated Taveras differently from similarly situated candidates.

Finally, Taveras has not raised a genuine issue of fact with respect to the hiring of Christopher Elliot. There is simply no evidence in the record — as opposed to a mere conclusory allegation — that Elliot was allowed to use a corrective lens when he was tested for color vision defects. On the contrary, all the evidence shows that Elliot did not obtain such a lens until *after* he was tested and, in any case, he was never required to, nor did he, use the lens on the job. Thus, no reasonable juror could conclude, based on the hiring of Christopher Elliot, that the Port Authority subjected Taveras to disparate treatment.

### C. Disparate Treatment from Nearsighted Candidates

Taveras contends that the Port Authority's policy of allowing nearsighted, but not color deficient, candidates to wear corrective lenses constitutes intentional disparate treatment. Under recent Second Circuit authority, however, nearsighted and color deficient candidates are not similarly situated for the purposes of a "class of one" claim.

> In order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high. . . . [T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are *prima facie* identical. We deem that test to require a plaintiff in such a 'class of one' case to show that: (i) no rational person could regard the

> circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.[31]

Taveras has not come forward with any specific facts to support a finding that his circumstances are *prima facie* identical to those of nearsighted candidates. Rather, Taveras relies solely on the conclusory allegation that the Port Authority's distinction between color deficient candidates on the one hand and nearsighted candidates on the other is arbitrary. The only evidence in the record shows that the Port Authority's differential treatment of color deficient and nearsighted candidates is based on a legitimate policy of ensuring that all officers can accurately identify and describe individuals and vehicles even without the aid of corrective lenses. Thus, Taveras cannot satisfy the first prong of the standard quoted above and, consequently, no reasonable juror could conclude that Taveras is similarly situated to nearsighted candidates for the purposes of his "class of one" claim.

## V. CONCLUSION

For the reasons stated above, the Port Authority's motion for

---

[31] *Neilson*, 2005 WL 1244795, at *4.

summary judgment is granted. The Clerk of the Court is directed to close this motion (docket # 16) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:	New York, New York
	June 10, 2005

## - Appearances -

**For Plaintiff:**

Brian W. Raum, Esq.
Law Offices of Brian W. Raum, P.C.
99 Wall Street, 19th Floor
New York, New York 10005
(212) 361-3718


**For Defendant:**

Angel Kelley, Esq.
Port Authority of New York and New Jersey
225 Park Avenue South, 13th Floor
New York, New York 10003
(212) 435-3436